NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0662n.06
Filed: August 4, 2005

No. 04-3949

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CLERMONT NURSING AND CONVALESCENT CENTER, | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW OF THE |
| v. | ) | FINAL DECISION OF THE SECRETARY |
| | ) | OF HEALTH AND HUMAN SERVICES |
| MICHAEL O. LEAVITT et al., | ) | |
| | ) | OPINION |
| | ) | |
| Respondents. | ) | |
| | ) | |

Before: CLAY, GILMAN, and COOK, Circuit Judges.

RONALD LEE GILMAN, Circuit Judge. Clermont Nursing and Convalescent Center appeals from the imposition by the Secretary of Health and Human Services, operating through the Centers for Medicare & Medicaid Services, of a civil monetary penalty imposed upon Clermont for noncompliance with federal regulations. For the reasons set forth below, we **DENY** review of the decision by the Health & Human Services's Departmental Appeals Board (DAB).

I. BACKGROUND

A. Factual background

Clermont is a nursing home located in Milford, Ohio. As a participant in the federal government's Medicare & Medicaid programs, Clermont is required by law to comply with all

-1-

federal regulations for nursing homes participating in these programs. On September 3, 1999, the Ohio Department of Health, acting by agreement with the United States Secretary of Health and Human Services (the Secretary), conducted a survey of the facility. This survey found that Clermont was not in compliance with 23 federal regulations for nursing homes participating in the Medicare and Medicaid programs. Of these 23 alleged instances of noncompliance, 2 are at issue in this appeal.

The first point of contention involves the surveyors' finding that Clermont was not in compliance with 42 C.F.R. § 483.25(c), which mandates that a facility ensure that a "resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable." The regulation further requires that a facility ensure that "[a] resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing." *Id.* A pressure sore is defined as "[d]amage to the skin or underlying structure as a result of tissue compression and inadequate perfusion." Taber's Cyclopedic Medical Dictionary 1675 (19th ed. 2001). They "typically occur in patients who are bed or chair bound." *Id.*

Clermont was fined on the basis of pressure sores that were found on five residents, referred to as Residents 43, 50, 72, 168, and 171. (Residents are assigned numbers by the Department of Health and Human Services to protect their identities.) The factual circumstances regarding these five residents are thoroughly discussed in the DAB's opinion. A detailed explanation by us of each resident's condition would therefore be repetitive.

The second point of contention involves the surveyors' finding that Clermont was not in compliance with 42 C.F.R. § 483.25(h)(2), which requires that a facility ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." Clermont was fined in this regard for the treatment of Residents 6, 14, 72, 147, and 163. Again, because the DAB has exhaustively described the circumstances in which each resident was observed, a factual exposition by us would be unduly repetitive.

**B.      Procedural background**

Based upon the deficiencies found by the Ohio Department of Health, the Centers for Medicare & Medicaid Services fined Clermont $651 per day for 51 days, beginning on September 3, 1999 and lasting through October 23, 1999. The total fine imposed on Clermont was $33,150.

Clermont responded by requesting a hearing before an administrative law judge (ALJ) pursuant to 42 C.F.R. § 488.408(g)(1). The ALJ concluded that two of the cited deficiencies—the noncompliance with pressure-sore treatment and the noncompliance with accident prevention—provided a sufficient basis for the fine imposed by the Centers for Medicare & Medicaid Services. He therefore declined to address the remaining 21 deficiencies.

Clermont subsequently appealed the decision by the ALJ to the DAB pursuant to 42 C.F.R. § 498.80. A three-member panel of the DAB affirmed the decision by the ALJ. Clermont filed a timely petition for review.

## II. ANALYSIS

**A.      Standard of review**

The Secretary's decision to impose a fine on a nursing home, "if supported by substantial evidence on the record considered as a whole, shall be conclusive." 42 U.S.C. § 1320a-7a(e); *see also Woodstock Care Ctr. v. Thompson*, 363 F.3d 583, 588 (6th Cir. 2003) (noting that, when reviewing such fines, "[o]ur standard of review is highly deferential"). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In our review, we do not consider the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 842 (6th Cir. 1990) (citations and quotation marks omitted). In addition, the question of whether the defendant in question took all reasonable precautions to prevent accidents is "highly fact-bound and can only be answered on the basis of expertise in nursing home management. As such, it is a question the resolution of which we defer to the expert administrative agency, the [Department of Health and Human Services]." *Woodstock Care Ctr.*, 363 F.3d at 589.

**B.      The appropriate legal standard**

Clermont's primary argument is that both the ALJ and the DAB applied the incorrect legal standard when assessing whether Clermont was in compliance with 42 C.F.R. §§ 483.25(c) and 483.25(h)(2). It contends that it was held to a strict-liability standard by the Department of Health and Human Services, and that this standard was an erroneous interpretation of the reasonableness standard required by the regulations.

With regard to 42 C.F.R. § 483.25(c)—the regulation governing pressure-sore development—Clermont contends that it was held to a strict-liability standard by the ALJ when he commented that

> a participating facility is required to go beyond merely doing what seems reasonable to prevent and treat pressure sores and, instead, must always furnish what is necessary to prevent new pressure sores from developing or existing pressure sores from becoming worse, unless the development of new sores or aggravation of existing sores is clinically unavoidable.

Clermont contends that the ALJ's conclusion that a facility "is required to go beyond merely doing what seems reasonable to prevent and treat pressure sores" exceeds Clermont's obligations under the federal regulations.

As the DAB observed, however, 42 C.F.R. § 483.25(c)(2) requires a facility to "ensure that [a] resident having pressure sores receives *necessary* treatment and services to promote healing, prevent infection and prevent new sores from developing." *Id.* (emphasis added). The ALJ's observation that a facility must furnish what is necessary to prevent and treat existing pressure sores, and the DAB's concurrence, therefore appears to us to be consistent with the requirements of 42 C.F.R. § 483.25(c).

In addition, we find nothing in the record to suggest that Clermont was held to a strict-liability standard by the DAB. The instances cited by the surveyors were ones in which the appropriate treatment was not being provided to residents suffering from pressure sores. For example, officials observed that Resident 50, who was suffering from several existing pressure sores, was restrained in his wheelchair for extended periods of time without any protective padding. They also observed Resident 50 lying in his bed wearing urine-soaked briefs for approximately two hours. When Clermont's staff came to provide incontinent care, the surveyors noted that urine was contaminating the pressure sore. These and other observations support the finding that Clermont

had failed to "ensure that [a] resident having pressure sores receives necessary treatment to promote healing, prevent infection and prevent new sores from developing."  42 C.F.R. §  483.25(c)(2).

Clermont further maintains that the ALJ and the DAB misconstrued the correct legal standard with regard to 42 C.F.R. § 483.25(h)(2), the regulation calling for the prevention of foreseeable accidents.  Specifically, Clermont claims that it was held to a strict-liability standard because the ALJ failed to draw any causal links between the accidents that occurred and Clermont's alleged noncompliance.

Clermont's argument, however, is belied by the detailed opinion of the DAB.  In that opinion, the DAB correctly notes that the key requirement is that "the facility must eliminate or reduce the *risk* of accident to the greatest degree practicable."  (Emphasis in original.)  It further observed that, "[a]s a risk-oriented analysis, this does not require that either an accident or resident injury actually occur for a violation to exist."  The DAB concluded that this eliminates the need "to establish accident causation in determining whether there was a lack of substantial compliance with this requirement."  Its analysis in this case is also consistent with its prior opinions.  *See Omni Manor Nursing Home*, D.A.B. No. 1920, at 38-39 (2004); *Woodstock Care Ctr.*, D.A.B. No. 1726, at 17 (2000).

In addition, the DAB specifically looked at whether each resident had received adequate supervision or assistance.  Nothing in the record suggests that the ALJ or the DAB took a "hindsight" approach.  For example, the surveyors saw Resident 72 lying in a bed with a waist restraint.  The waist restraint was improperly affixed because it was attached to a nonmovable part of the bed frame and because it was wrapped around her chest.  This could have led the resident to

seriously injure herself. Such observations support the DAB's finding that Cermont was in violation of 42 C.F.R. § 483.25(h)(2), which requires that a facility ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents."

**C.      Substantial evidence**

Clermont's remaining argument is that the decision by the DAB is not supported by substantial evidence. It proceeds on a resident-by-resident basis to contend that the DAB misconstrued or overlooked key facts in examining the record.

We believe that revisiting the factual circumstances and medical histories of each resident would be unduly duplicative. The record contains numerous facts with regard to each resident that buttress the DAB's decision, and Clermont's arguments to the contrary are unpersuasive. We therefore conclude that the decision by the DAB is supported by substantial evidence.

## III.  CONCLUSION

For all of the reasons set forth above, we **DENY** review of the decision by the DAB.