NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0810n.06

No. 12-4420

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Sep 06, 2013*
DEBORAH S. HUNT, Clerk

LIFE CARE CENTER OF BARDSTOWN,

    Petitioner,

         v.

SECRETARY OF UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

    Respondent.

On Appeal from the
Department of Health &
Human Services

---

**Before:**     **BATCHELDER, Chief Judge; GUY and MOORE, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge**.    Petitioner, Life Care Center of Bardstown

("the Center") operates a skilled nursing facility in Bardstown, Kentucky. Because the

Center participates in the Medicare and Medicaid programs, the United States Department

of Health and Human Services ("HHS") mandates that the facility meet certain participation

requirements. The Centers for Medicare and Medicaid Services ("CMS") oversees

compliance with such requirements.

    After an April 2007 compliance survey, CMS found that the Center was not in

substantial compliance with several of the participation requirements and found that the

problems put resident health and safety in "immediate jeopardy." As a result, CMS imposed a civil monetary penalty ("CMP") of $4,050 per day against the Center until such conditions were remedied.

The Center appealed the non-compliance finding and the imposition of the CMP to an administrative law judge ("ALJ"). After an involved administrative appeals process, the HHS Departmental Appeals Board ("DAB") sustained the ALJ's decision and the imposition of the CMP. The Center filed this timely appeal. For the following reasons, we **AFFIRM**.

## I.

Central to CMS's non-compliance finding was the death of one of the Center's residents on January 3, 2007 (referred to as "Resident 1"). CMS conducted a survey of the Center on April 3, 2007, which focused on the events surrounding Resident 1's death.[1] On April 20, 2007, CMS issued a Statement of Deficiencies ("SOD") that identified three participation requirements with which the Center was not in substantial compliance that also put resident health and safety in "immediate jeopardy": (1) the physician consultation requirement (42 C.F.R. § 483.10(b)(11)); (2) the quality of care requirement (42 C.F.R. § 483.25); and (3) the facility administration requirement (42 C.F.R. § 483.75). Based on these

---

[1] The Kentucky Office of the Inspector General actually conducted this survey (pursuant to 42 U.S.C. § 1395i-3(g) and 42 U.S.C. § 1395aa) and issued the subsequent Statement of Deficiencies ("SOD"), which CMS adopted when it imposed the CMP.

deficiencies, CMS imposed the $4,050 per day CMP, effective January 3, 2007 (the day of Resident 1's death) through March 27, 2007.[2]

The Center appealed CMS's determinations to an ALJ. After a hearing, the ALJ issued a decision on July 16, 2008 (the "initial decision"), finding that the Center was in substantial compliance with 42 C.F.R. §§ 483.10(b)(11), 483.25, and 483.75, and that the CMP was, therefore, not warranted. CMS appealed that decision to the DAB, which vacated the ALJ's initial decision and remanded the matter so that the ALJ could address conflicting evidence.[3] The DAB also concluded that the ALJ erred in finding that the alleged violations of 42 C.F.R. §§ 483.25 and 483.75 were derivative of a violation of 42 C.F.R. § 483.10(b)(11), and ordered the ALJ to consider those alleged deficiencies independently. Finally, the DAB reversed the ALJ's initial decision with respect to violations of 42 C.F.R. §§ 483.20(d)(3) and 483.10(k)(2) (the comprehensive care plan requirements). Because the Center does not challenge this reversal, we do not address it.

On remand, the ALJ upheld CMS's findings that the Center failed to substantially comply with 42 C.F.R. §§ 483.10(b)(11), 483.25, and 483.75, and that such noncompliance put resident health and safety in "immediate jeopardy" from January 3, 2007 through March

---

[2]From March 28, 2007 until April 10, 2007, CMS imposed a CMP of $100 per day because, although the problem conditions were no longer at the "immediate jeopardy" level, the Center was still not in substantial compliance with all participation requirements. The Center does not appeal the $100 CMP imposed for the latter time-period.

[3]The Center repeatedly mischaracterizes the DAB's remand order stating that the DAB: (1) ordered the ALJ to find violations of the participation requirements; (2) overruled the ALJ's initial credibility finding with respect to a key witness (Nurse Suffoletta); and (3) assumed the ALJ's role of fact-finder. After a thorough review of the ALJ decisions and the DAB orders, we find no basis for such characterizations.

27, 2007. The ALJ also upheld the imposition of the $4,050 per day CMP as reasonable (we refer to this decision as the "ALJ's final decision"). The DAB sustained that decision and the Center appealed to this Court.

## II.

We sustain HHS's factual findings "if supported by substantial evidence on the record considered as a whole." *Woodstock Care Ctr. v. Thompson*, 363 F.3d 583, 588 (6th Cir. 2003); *see also* 42 U.S.C. § 1320a 7a. We only overturn HHS's interpretation of its regulations where such interpretation is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Id*. (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 842 (6th Cir. 1990) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "[W]e do not consider the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Id*.

## III.

**A.     The ALJ's Decision Is Supported By Substantial Evidence[4]**

    **1.     Background**

---

[4]The Center makes general arguments that CMS: (1) failed to make a prima facie case of non-compliance; (2) changed its basis for sanctions in its request for review; and (3) produced new evidence on appeal. After a review of the record, we find no merit to these arguments.

Resident 1 was an 87-year-old woman who suffered from Alzheimer's disease, diabetes, and hypertension. On the night of January 2, 2007, Nurse Suffoletta, a licensed professional nurse with the Center, was responsible for Resident 1's care. At approximately 4 a.m. on January 3, Resident 1 was found unresponsive with unstable vital signs. Per the Center director's instructions, Nurse Suffoletta called for emergency medical services ("EMS"). EMS arrived at approximately 4:20 a.m. and transported Resident 1 to the hospital where she died at 7:10 a.m.

**2.      Physician Consultation Requirement – 42 C.F.R. § 483.10(b)(11)**

CMS alleged that the Center failed to substantially comply with the physician consultation requirement, which provides:

> A facility must immediately inform the resident; consult with the resident's physician; and if known, notify the resident's legal representative or an interested family member when there is . . . [a] significant change in the resident's physical, mental, or psychosocial status (i.e., a deterioration in health, mental, or psychosocial status in either life-threatening conditions or clinical complications).

42 C.F.R. § 483.10(b)(11). The parties agree that if Resident 1 experienced two episodes of vomiting on the night in question, Nurse Suffoletta was required to contact the resident's physician pursuant to this regulation. It is undisputed that Resident 1 vomited around 8 p.m. on January 2. CMS argues that she vomited again between midnight and 1 a.m. on January 3. The Center disputes that claim, arguing that Resident 1 merely coughed up medicine rather than vomited. In its final decision, the ALJ determined that Resident 1 vomited rather

5

than spit up at 1 a.m., and that Nurse Suffoletta's failure to contact Resident 1's physician at that time constituted a failure to substantially comply with 42 C.F.R. § 483.10(b)(11).

After a thorough review of the record, we conclude that this finding is supported by substantial evidence. The ALJ based his finding on: (1) Nurse Suffoletta's nursing notes, which indicated that vomit was present on Resident 1's night clothes after the 1 a.m. episode (so much vomit, in fact, that the nurse changed Resident 1's clothes); and (2) Nurse Suffoletta's statement to surveyors that Resident 1 vomited *again* between 12 a.m. and 1 a.m. The Center argues that such interviews never took place, yet two surveyors testified at the ALJ hearing that they did in fact interview Nurse Suffoletta although they failed to take notes at such interview.

A reasonable mind could conclude, based on such evidence, that Resident 1 did in fact experience a second episode of vomiting. The Center argues that Nurse Suffoletta's testimony at the ALJ hearing established that Resident 1 did not vomit between midnight and 1 a.m. As discussed below, the ALJ rejected such testimony as not credible (a determination we affirm).

### 3.    Quality of Care Requirement – 42 C.F.R. § 483.25

CMS alleged that the Center failed to substantially comply with the quality of care requirement, which provides: "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of

care." 42 C.F.R. § 483.25. In support of this allegation, CMS noted six findings in its SOD any one of which would independently establish a violation of this requirement.[5] Because we need not address each of those findings, we limit our focus to CMS's finding that the Center failed to implement Resident 1's physician's order to take her oxygen saturation readings daily. In his final decision, the ALJ found that the Center failed to comply with such order, constituting a failure to substantially comply with the quality of care requirement.

We conclude that such finding is supported by substantial evidence. The parties agree that Resident 1's physician had ordered the Center to take her oxygen saturation readings daily, and the Center does not dispute that there is no record of such daily readings. Rather, the Center argues that it was complying with such order through a "documentation by exception" policy where nurses document only abnormal readings. In rejecting that argument, the ALJ found that the Center had not proven that it had adopted a "documentation by exception" policy or that it had trained its staff in such practice. Given that the Center has not pointed to any record evidence to the contrary, a reasonable mind could conclude that the

---

[5]Specifically, the SOD cited the following failures: (1) the Center failed to implement Resident 1's physician's orders to take routine vital signs and daily oxygen saturation readings; (2) the Center's policy of "documentation by exception" of vital signs and oxygen saturation levels was not acceptable given Resident 1's physician's explicit orders; (3) between 4:00 a.m. and 4:21 a.m. on January 3, 2007, the Center failed to suction or administer oxygen to Resident 1 (when her oxygen level was 46%) despite her physician's order that oxygen be administered when such levels fell below 88%; (4) the Center failed to give EMS a verbal report of Resident 1's allergies, recent medical history, or inform them that Resident 1 had been vomiting; (5) the Center's transfer paperwork for EMS failed to reveal that Resident 1 had been repeatedly vomiting; and (6) the Center's attending physician who reviewed the nursing documentation opined that the Center did not do anything for Resident 1 until they "found her on death's door." In his final decision, the ALJ found that citations one through five supported a finding of noncompliance with the quality of care requirement (individually) but that the sixth finding did not.

Center was not complying with the physician's order, through a documentation by exception policy or otherwise.

The Center claims CMS failed to establish that the Center's failure to comply with the physician's order constituted a violation of the quality of care standard. We disagree. The DAB has held that the quality of care standard requires facilities to "carry out *every* applicable [physician] order and ensure the sufficiency of resident care plans so that each resident receives all of 'the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being.' 42 C.F.R. § 483.25." *Alexandria Place*, DAB No. 2245, at 6 (2009) (emphasis in original). Because the Center failed to carry out the physician's order as directed, a finding of a violation was appropriate.

### 4. Facility Administration Requirement – 42 C.F.R. § 483.75

CMS alleged that the Center failed to substantially comply with the facility administration requirement, which provides, "[a] facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." 42 C.F.R. § 483.75. In support of this allegation, CMS noted three findings in its SOD     any one of which would independently establish a violation of this requirement.[6]

---

[6]The SOD cited the following failures as a basis for the facility administration violation: (1) the Center administrator failed to take necessary actions to correct deficient practices involving residents with a significant change in condition and investigate events contributing to deficient practices; (2) the Center administrator failed to ensure all staff were properly trained in the Center's physician notification policy; and (3) the Center administrator failed to investigate the incident involving Resident 1's death to determine the cause.

The ALJ upheld CMS's findings and also determined that, as an alternative basis, the Center had violated the facility administration requirement because it failed to substantially comply with both the quality of care requirement and the physician participation requirement, which put resident health and safety in "immediate jeopardy." The ALJ relied on *Asbury Ctr., at Johnson City*, where the DAB held that:

> [W]here a facility has been shown to be so out of compliance with program requirements that its residents have been placed in immediate jeopardy, the facility was not administered in a manner that used its resources effectively to attain the highest practicable physical, mental, and psychosocial well-being of each resident.

*Asbury Ctr., at Johnson City*, DAB No. 1815, at 7 (2002), *aff'd*, *Asbury Ctr., at Johnson City v. U.S. Dep't of Health & Human Servs.*, 77 F. App'x 853, 857-58 (6th Cir. 2003).

We note that CMS's determination that the cited deficiencies put resident health and safety in "immediate jeopardy" under 42 C.F.R. § 488.301 must be upheld unless it was clearly erroneous. 42 C.F.R. § 498.60(c)(2). The Center has failed to prove there was clear error in such finding. Because we affirm the ALJ's findings that the Center failed to substantially comply with the physician consultation requirement and the quality of care requirement, and that such non-compliance put resident health and safety in "immediate jeopardy," we also uphold the finding that the Center failed to substantially comply with the facility administration requirement.

**CMS's January 2007 Compliance Finding**

9

The parties agree that CMS made a finding in January 2007 that the Center was in compliance with the facility administration requirement (42 C.F.R. § 483.75).[7] In the SOD, however, CMS noted that the Center failed to comply with such requirement. The Center argues that the SOD is therefore inconsistent with the January 2007 finding of compliance and the ALJ's decision is not sound. We disagree.

First, a mere finding by CMS that the Center's policy was in compliance with the facility administration requirement is not a finding that all of the Center's staff were properly trained to administer that policy.[8] As the ALJ noted in his final decision:

> The problem in this case has never been the [Center's physician notification] policy, which essentially restates the [American Medical Director's Association] guidelines. The problem is Nurse Suffoletta's understanding and application of that policy. I accept that [the Center] trained Nurse Suffoletta on the policy. However, assuming [the Center] did so, the training was deficient.

Second, as we note above, the ALJ's finding that the Center failed to substantially comply with the facility administration requirement is supported by substantial evidence. Finally, the fact that CMS found that the Center was being administered in accordance with the participation requirements in certain instances does not change the fact that CMS determined that the Center was not being administered properly in its care of Resident 1. Given that

----

[7]This January 2007 finding of compliance is not a part of the administrative record, so we cannot evaluate this claim independently.

[8]To the extent the Center argues that the 2007 compliance finding determined that the Center had properly trained its staff to administer the physician notification policy, it fails to cite to any record evidence to support that claim.

there is no evidence that the January 2007 finding of compliance reviewed the care provided to Resident 1, we find no inconsistency.

**B.    The CMP's Duration**

The Center also challenges the duration of the CMP. "This Court may only reverse the duration of noncompliance if it is left with a definite and firm conviction that the Secretary committed a clear judgment error in reaching its conclusion after weighing the relevant factors." *Golden Living Ctr.-Frankfort v. Sec'y Of Health And Human Servs.*, 656 F.3d 421, 429 (6th Cir. 2011).

Although the Center argues that the CMP should be limited to the day of Resident 1's death, we do not believe that it was a clear error for CMS to impose it from January 3, 2007 (the day of Resident 1's death) through March 27, 2007. In his final decision, the ALJ noted that CMS did not deem the "immediate jeopardy canceled" until the Center had conducted additional in-services regarding physician notification, documentation, and carrying out physician orders. The Center fails to demonstrate how such conclusion was "clear error."

The Center also argues that the holding in *Golden Living Ctr.-Frankfort* (as identified in other DAB decisions) runs afoul of §§ 556(d) and 706(2)(A) of the Administrative Procedure Act. The Center's argument on this point is unpersuasive and we decline to overturn precedent based on it.

**C.    The ALJ's Credibility Determination**

11

The Center claims that the DAB improperly reversed the ALJ's initial decision that Nurse Suffoletta was credible and that it did so based on evidence that CMS raised for the first time on appeal. After a thorough review of the record, we find no basis for either argument.

First, the DAB did not reverse the ALJ's determination that Nurse Suffoletta was credible; rather, the DAB noted several pieces of evidence that "undercut[] the ALJ's assessment of Nurse Suffoletta's credibility" and directed "the ALJ on remand to reevaluate and discuss his prior assessment of Nurse Suffoletta's credibility and the reliability of her hearing testimony and nursing notes in light of the conflicting evidence discussed in this decision." Far from reversing the ALJ's credibility determination, the DAB was simply asking for the ALJ to address conflicting evidence so the DAB could properly review his findings. Second, the conflicting evidence that the DAB cited was referenced in either

No. 12-4420

CMS's SOD or through testimony at the February 19, 2008 ALJ hearing.[9] The Center's

allegation that such evidence was presented for the first time on appeal is baseless.

**AFFIRMED.**

---

[9]The DAB's first finding that the Center challenges concerned whether Resident 1 vomited between midnight and 1 a.m. on January 3, 2007. It is undisputed that, at that time, Nurse Suffoletta noticed some vomit on Resident 1's nightgown. The ALJ initially determined that the vomit was likely "the final, much-less-serious, manifestation of the episode that had begun earlier in the evening." On initial review, the DAB noted that this finding conflicted with a statement Nurse Suffoletta made to a surveyor where she "revealed the resident vomited again between 12:00 a.m. and 1:00 a.m." On remand, the DAB instructed the ALJ to address this inconsistency. This statement was contained in CMS's SOD.

The second finding that the Center challenges concerned whether Nurse Suffoletta took Resident 1's vital signs in the 12 hours preceding Resident 1's transport by EMS. The ALJ initially determined that Nurse Suffoletta took (but failed to record) Resident 1's vital signs twice between 8 p.m. on January 2 and 2 a.m. on January 3, and that such vital signs were normal. The ALJ based this finding on Nurse Suffoletta's testimony (which he initially found credible) and on the fact that "CMS never disputed whether Nurse Suffoletta or [the Center] staff actually took Resident 1's vital signs and did not dispute that 'documentation by exception' is a common practice." The DAB remanded this finding so that the ALJ could consider and address: (1) Nurse Suffoletta's statements to surveyors where she admitted she did not take Resident 1's vitals after either the 8 p.m. vomiting episode or after the 1 a.m. episode; (2) testimony from Resident 1's granddaughter (who was present that night) that she never observed a Center employee take Resident 1's vitals; (3) Nurse Suffoletta's equivocal testimony that someone else "probably" took Resident 1's vitals at the time in question; and (4) the surveyor's notes in the SOD that indicated that the CNA responsible for Resident 1 on the night in question did not take her vital signs.

13